**BICK LAW LLP**
ALAN N. BICK, State Bar No. 151452
CAROLINE L. PLANT, State Bar No. 247358
TYLER M. ALEXANDER, State Bar No. 313188
HEATHER DADASHI, State Bar No. 341522
520 Newport Center Drive, Suite 750
Newport Beach, CA 92660
Telephone: (949) 432-3500
Facsimile: (949) 432-3494
abick@bicklawllp.com
cplant@bicklawllp.com
talexander@bicklawllp.com
hdadashi@bicklawllp.com

Attorneys for Defendant
UNIVERSAL WASTE SYSTEMS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| KRISTINA BROWN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ARAKELIAN ENTERPRISES, INC. d/b/a ATHENS SERVICES, *et al.*,<br><br>Defendants. | Case No.: 2:25-cv-02855-MWC-PD<br><br>**DEFENDANT UNIVERSAL WASTE SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Assigned to:<br>Hon. Michelle Williams Court<br><br>Action Filed: April 3, 2025<br>Hearing Date: November 6, 2026<br>Time: 1:30 pm |

**DEFENDANT UNIVERSAL WASTE SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 6, 2026, at 1:30 PM, or as soon thereafter as the matter may be heard, in courtroom 6A of the Honorable Michelle Williams Court, located at Felicitas and Gonzalo Mendez United States Courthouse, 350 W 1st St, Los Angeles, CA 90012, Defendant Universal Waste Systems, Inc. will and hereby does move this Court for an order granting summary judgment in its favor in this action, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.

This Court should enter summary judgment for Universal because there is no genuine dispute as to any material fact and Universal is entitled to judgment as a matter of law. Specifically:

1. Plaintiffs cannot establish that Universal violated any of the Environmental Protection Agency's open dumping regulations at 40 C.F.R. § 257.3;
2. Even assuming a historical violation, the alleged conduct is wholly past and not actionable under the Resource Conservation and Recovery Act's citizen suit provision, 42 U.S.C. § 6972(a)(1)(A); and
3. Plaintiffs cannot demonstrate an imminent and substantial endangerment to human health or the environment under 42 U.S.C. § 6972(a)(1)(B).

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in Support of Universal's Motion for Summary Judgment, the Declaration of Tyler M. Alexander, the Statement of Undisputed Facts submitted pursuant to Local Rule 56-1, all pleadings and records on file in this action, and such further evidence and argument as may be presented at or before the hearing on this Motion.

Dated: September 18, 2026

By */s/ Tyler M. Alexander*
Tyler M. Alexander
BICK LAW LLP

Attorney for Defendant
UNIVERSAL WASTE SYSTEMS, INC.

# TABLE OF CONTENTS

INTRODUCTION .......... v
FACTUAL BACKGROUND .......... 2
STATUTORY BACKGROUND .......... 3
I. California SB 1383 .......... 3
II. The Resource Conservation and Recovery Act (RCRA) .......... 4
STANDARD OF REVIEW .......... 4
ARGUMENT .......... 5
I. Universal Never Contributed to "Open Dumps." .......... 6
A. 40 C.F.R. § 257.3-2 – Endangered Species. .......... 7
B. 40 C.F.R. § 257.3-3 – Surface Water. .......... 8
C. 40 C.F.R. § 257.3-4 – Ground Water. .......... 8
D. 40 C.F.R. § 257.3-6 – Disease. .......... 10
E. 40 C.F.R. § 257.3-7 – Air. .......... 10
F. 40 C.F.R. § 257.3-8 – Safety. .......... 11
II. Wholly Past Open Dumping Violations Are Not Actionable. .......... 12
III. Plaintiffs Prove No Imminent and Substantial Endangerment to Human Health or the Environment. .......... 15
A. Plaintiffs Have No Evidence of Air Quality Harms. .......... 16
B. Plaintiffs' Self-Ignition Theory Is Implausible. .......... 17
C. Plaintiffs Show No Water Impacts .......... 18
D. Plaintiffs' Alleged Wildlife and Habitat Harms Are Speculative .......... 20
1. The Chow/Dalby Report does not prove habitat loss. .......... 20
2. Plaintiffs cannot show substantial harm to wildlife. .......... 22
3. Any *de minimis* habitat alteration is historical, not "imminent." .......... 24
CONCLUSION .......... 25

# TABLE OF AUTHORITIES

## Cases

*Acme Printing Ink Co. v. Menard, Inc.*
891 F. Supp. 1289 (E.D. Wis. 1995) .......... 14

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) .......... 5

*Ascon Props., Inc. v. Mobil Oil Co.*
866 F.2d 1149 (9th Cir. 1989) .......... 13

*Ashoff v. City of Ukiah*
130 F.3d 40 (9th Cir. 1997) .......... 5

*Bd. of Comm'rs of Cnty. of La Plata v. Brown Grp. Retail, Inc.*
598 F. Supp. 2d 1185 (D. Colo. 2009) .......... 15

*California v. M&P Invs.*
308 F. Supp. 2d 1137 (E.D. Cal. 2003) .......... 14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .......... 5, 17

*City of Chicago v. Envtl. Def. Fund*
511 U.S. 328 (1994) .......... 4

*City of Fresno v. United States*
709 F. Supp. 2d 934 (E.D. Cal. 2010) .......... 19, 20

*Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*
989 F.2d 1305 (2d Cir. 1993) .......... 12, 14

*Conservation Law Found. v. Shell Oil Co.*
628 F. Supp. 3d 416 (D. Conn. 2022) .......... 12

*Covington v. Jefferson County*
358 F.3d 626 (9th Cir. 2004) .......... 9, 10

*Ctr. for Biological Diversity v. U.S. Forest Serv.*
80 F.4th 943 (9th Cir. 2023) .......... 4

*Defs. of Wildlife v. Bernal*
204 F.3d 920 (9th Cir. 2000) ........................................ 23, 24
*Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*
756 F. Supp. 3d 1062 (D. Or. 2024) ........................................ 15, 25
*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*
451 F.3d 1005 (9th Cir. 2006) ........................................ 23
*Gache v. Harrison*
813 F. Supp. 1037 (S.D.N.Y. 1993) ........................................ 14
*Goldfarb v. Mayor & City Council of Balt.*
791 F.3d 500 (4th Cir. 2015) ........................................ 12
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*
484 U.S. 49 (1987) ........................................ 1, 12, 13, 14
*H & H Holding, L.P. v. Chi Choul Lee*
No. 12-5433, 2014 WL 958878 (E.D. Pa. Mar. 6, 2014) ........................................ 16
*Hackensack Riverkeeper, Inc. v. Del. Ostego Corp.*
450 F. Supp. 2d 467 (D.N.J. 2006) ........................................ 6
*In re Oracle Corp. Sec. Litig.*
627 F.3d 376 (9th Cir. 2010) ........................................ 5
*June v. Town of Westfield*
370 F.3d 255 (2d Cir. 2004) ........................................ 14
*Lewis v. FMC Corp.*
786 F. Supp. 2d 690 (W.D.N.Y. 2011) ........................................ 21, 22
*Lexington Ins. Co. v. W. Pa. Hosp.*
423 F.3d 318 (3d Cir. 2005) ........................................ 9
*Living Lands, LLC v. Cline*
657 F. Supp. 3d 831 (S.D. W. Va. 2023) ........................................ 6, 16, 21, 22
*Marrero Hernandez v. Esso Standard Oil Co. (Puerto Rico)*
597 F. Supp. 2d 272 (D.P.R. 2009) ........................................ 14

*Meghrig v. KFC W., Inc.*
516 U.S. 479 (1996) .......................................................................... 4, 15, 17, 25

*Miller v. City of Fort Myers*
424 F. Supp. 3d 1136 (M.D. Fla. 2020) ........................................................ 20

*N. Cal. River Watch v. Exxon Mobil Corp.*
No. C 10-0534 PJH, 2010 WL 3184324 (N.D. Cal. Aug. 11, 2010) ................ 14

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*
23 F.3d 1508 (9th Cir. 1994) ........................................................................ 23

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*
210 F.3d 1099 (9th Cir. 2000) ........................................................................ 5

*O'Leary v. Moyer's Landfill, Inc.*
523 F. Supp. 642 (E.D. Pa. 1981) .............................................................. 9, 10

*Price v. U.S. Navy*
39 F.3d 1011 (9th Cir. 1994) .................................................................... 15, 17

*Rapanos v. United States*
547 U.S. 715, 739 (2006) ................................................................................ 8

*S. Rd. Assocs. v. Int'l Bus. Machines Corp.*
216 F.3d 251 (2d Cir. 2000) ..................................................................... 12, 14

*Sackett v. EPA*
598 U.S. 651 (2023) ........................................................................................ 8

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*
575 F.3d 199 (2d Cir. 2009) ..................................................................... 20, 21

*Soremekun v. Thrifty Payless, Inc.*
509 F.3d 978 (9th Cir. 2007) ........................................................................... 5

*Sullins v. Exxon/Mobil Corp.*
No. 08–04927 CW, 2010 WL 11575443 (N.D. Cal. May 18, 2010) ................ 12

*Tri-Realty Co. v. Ursinus Coll.*
124 F. Supp. 3d 418 (E.D. Pa. 2015) ................................................................ 9

*Verse Two Props., LLC v. MedPlast Fremont, Inc.*
No. 5:14-cv-03765-EJD, 2015 WL 6955133 (N.D. Cal. Nov. 10, 2015) ......... 14

**Statutes**

United States Code

16 U.S.C. § 1532(19) ........ 7
16 U.S.C. § 1532(19) ........ 23
16 U.S.C. § 1538(a)(1)(B) ........ 23
33 U.S.C. § 1251 et seq. ........ 8
42 U.S.C. § 6902 ........ 4
42 U.S.C. § 6944(a) ........ 6
42 U.S.C. § 6972(a)(1) ........ 4
42 U.S.C. § 6972(a)(1)(A) ........ ii, 12, 25
42 U.S.C. § 6972(a)(1)(B) ........ ii, 15, 25

California Code

Cal. Health & Safety Code § 39730.6 ........ 3
Cal. Pub. Res. Code § 42652.5(a) ........ 3
Cal. Pub. Res. Code § 42652.5(i) ........ 4
Cal. Pub. Res. Code §§ 42652-42656 ........ 3

**Other Authorities**

*Engage*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/engage#h1 (last visited Aug. 31, 2026) ........ 11

**Rules**

Fed. R. Civ. P. 56(a) ........ 4
Fed. R. Evid. 702(a) ........ 11

**Regulations**

Code of Federal Regulations

33 C.F.R. § 323.2(e) (2025) .... 8
33 C.F.R. pt. 323 .... 8
40 C.F.R. § 120.2 .... 8
40 C.F.R. § 257.1(a) .... 6
40 C.F.R. § 257.2 .... 6
40 C.F.R. § 257.3 .... ii, 1, 6
40 C.F.R. § 257.3-1 .... 6
40 C.F.R. § 257.3-2 .... 7, 8
40 C.F.R. § 257.3-2(a)-(b) .... 7, 8
40 C.F.R. § 257.3-2(c) .... 7
40 C.F.R. § 257.3-3 .... 7, 8
40 C.F.R. § 257.3-4 .... 8
40 C.F.R. § 257.3-4(c)(2) .... 9
40 C.F.R. § 257.3-6 .... 7, 10
40 C.F.R. § 257.3-6(c)(4) .... 10
40 C.F.R. § 257.3-7 .... 7
40 C.F.R. § 257.3-7(a)-(b) .... 10
40 C.F.R. § 257.3-7(b) .... 11
40 C.F.R. § 257.3-8 .... 7
40 C.F.R. § 257.4 .... 9
40 C.F.R. §§ 257.1-257.4 .... 6
40 C.F.R. §§ 257.50-257.107 .... 6
40 C.F.R. §§ 257.5-257.30 .... 6
40 C.F.R. pt. 257, app. I .... 9
50 C.F.R. § 17.3 .... 23

50 C.F.R. §§ 17.95-17.96 ........ 7

California Code of Regulations

14 CCR § 17852(a)(24.5) (2024) ........ 4
14 CCR § 17852(a)(24.5)(A) ........ 3
14 CCR § 18983.1(b)(6) ........ 4
14 CCR §18990.1(b) (2024) ........ 4

## INTRODUCTION

As they rot in landfills, green and organic wastes release methane, a greenhouse gas (GHG) about eighty-four times as potent as carbon dioxide. So in 2016, California passed SB 1383, aimed at diverting more than twenty million tons of organic materials annually. Universal Waste Systems, Inc. helps achieve that goal by sending green bin materials from home waste collection—landscaping trimmings and other organics—to Green Wise Soil Technologies, LLC. Green Wise screens contaminants and processes green waste into soil health products, which are then sold to nurseries, public parks, and others. Because Green Wise's permit limits storage on site, and because Green Wise cannot send compostable green waste to landfills, from 2020 through 2024, Green Wise paid Cal-Spreading, LLC to spread excess screened and shredded green waste at land application sites near Lancaster, California.

Plaintiff Kristina Brown owns property next to one of the former land application sites. Plaintiff Ashley Mroz lives within a few miles of two others. Though Green Wise stopped deliveries and Cal-Spreading ceased all operations about two years ago, Plaintiffs have maintained this action, promising to show ongoing human health and environmental harms that require abatement.

Fact and expert discovery are now closed. And the undisputed evidence shows that this case should not have been filed. At this late hour, Plaintiffs have no competent summary judgment evidence showing Universal violated EPA's open dumping regulations at 40 C.F.R. § 257.3. Even if Plaintiffs could support a historical violation, there is no dispute that operations at the subject land application sites ended months before Plaintiffs sued, which is fatal under the Supreme Court's decision in *Gwaltney*. Finally, Plaintiffs fail to prove up ongoing or imminent human health or environmental harms.

For the reasons stated below, there is nothing for trial. This Court should grant summary judgment for Universal.

## FACTUAL BACKGROUND

Universal is a family-owned waste disposal business headquartered in Santa Fe Springs, California. *See* Alexander Decl., Ex. 1 at 4-2 to 4-3. Universal collects and processes residential and municipal waste in Southern California, Arizona, New Mexico, and Kansas. *Id.* at 4-2. Separately, Universal contracts for green waste mulching at Green Wise in South Gate, California, where Green Wise processes about 60,000 tons of green waste, wood waste, compost, and mulch annually. UF ¶ 1. Most of that product is sold for soil enrichment and water retention at nurseries, parks, playgrounds, and residential properties. *Id.* at 4-3. Green Wise also distributes mulch to Universal's residential customers on customer appreciation days, and in the last 18 months has sent compostable green waste to rehabilitate a distressed golf course. In all cases, Green Wise helps keep green waste out of California landfills. *See* Alexander Decl., Ex. 12 at 113-14.

About 90% of green waste processed at Green Wise arrives via green bin collections along Universal's routes. *See* Alexander Decl., Ex. 1 at 4-3. The remainder comes in from smaller waste collectors or landscapers. But all green waste undergoes the same process. Green waste is screened multiple times to remove impurities or irregularities. *See* Alexander Decl., Ex. 2 at 6-1 (describing screening process). Green Wise then arranges clean green waste into windrows—long, organized piles where they cure. Later, the materials are shredded into varied sizes, combined with clean, untreated wood, and run through a grinder. Some of the materials from that process are turned into "mulch" or "ready mix." The smaller materials are called "green waste fines." Green waste fines are sometimes ground a second time to create an even finer product to suit customer demand. All green waste spends at least thirty days at Green Wise before leaving. *Id*. at 4-3 to 4-4.

The reality in California is that the supply of green waste outstrips the demand. *See id*. at 6-1. So from 2020 until 2024, Green Wise sent excess green

waste fines to Cal-Spreading for land application, at a cost to Universal. UF ¶ 2. Before folding, Cal-Spreading operated three land application sites:

(1) The Irwin Site, 18350 W. Lancaster Rd., Lancaster, CA 93536.

(2) The Three Points Site, 49155 Three Points Rd., Lancaster, CA 93536.

(3) The Kern Site, 280th Street W. and Patterson Rd. in Kern County.

*Id*. All or nearly all Green Wise green waste fines sent to Cal-Spreading were land applied at either Irwin or Three Points. Alexander Decl., Ex. 4 at 60, ll. 18-25.[1] Neither Universal nor Green Wise accepts construction and demolition waste. *Cf.* Alexander Decl., Ex. 14 at ¶ 81. Neither makes digestate or sludge. *Cf. id*. ¶ 99. Green Wise only sent compostable green waste to Cal-Spreading and ceased doing so before this case was filed.

## STATUTORY BACKGROUND

### I. <u>California SB 1383</u>

In 2016, California adopted SB 1383, a comprehensive strategy to reduce short-lived climate pollutants by, among other measures, diverting organic materials from landfills. Cal. Pub. Res. Code §§ 42652-42656. The California Department of Resources Recycling and Recovery (CalRecycle) has promulgated "regulations to achieve the organic waste reduction goals," *id.* § 42652.5(a), of "[a] 75-percent reduction in the level of the statewide disposal of organic waste from the 2014 level by 2025." Cal. Health & Safety Code § 39730.6.

Land application[2] helps achieve these diversion goals. CalRecycle's Title

---

[1] No Green Wise material made it to the New West Tractor or WPL sites, which were not operated by Cal-Spreading.

[2] "Land Application" means "[t]he final deposition of compostable material and/or digestate spread on a parcel of land, including land zoned only for agricultural uses[.]" Cal. Code. Regs. tit. 14 (14 CCR) § 17852(a)(24.5)(A).

14 regulations[3] govern the materials suitable for land application and specify composition, frequency, and amount. *See, e.g.*, 14 CCR § 17852(a)(24.5) (2024). California law expressly recognizes land application and prohibits local jurisdictions from banning its use. *See id.* §§ 18983.1(b)(6), 18990.1(b) (2024); Cal. Pub. Res. Code § 42652.5(i). Diversion through land application of green waste is thus lawful, needful, and integral to California's GHG reduction goals.

## II. The Resource Conservation and Recovery Act (RCRA)

The Resource Conservation and Recovery Act of 1976 (RCRA) aims to reduce the generation of solid and hazardous waste and protect human health and the environment. 42 U.S.C. § 6902; *accord City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331 (1994) (describing "cradle to grave" regulation of hazardous waste under RCRA Subtitle C and "much more loosely" regulated nonhazardous waste under Subtitle D). RCRA is not principally a cleanup statute. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (comparing RCRA to CERCLA). Still, RCRA includes a citizen suit provision allowing limited private enforcement. 42 U.S.C. § 6972(a)(1). The sole remedy in a RCRA citizen suit is abatement; the district court may enjoin an ongoing violation or "order such person to take such other action as may be necessary, or both[.]'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 948 (9th Cir. 2023).

## STANDARD OF REVIEW

This Court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the nonmoving party bears the burden at trial, the movant satisfies its initial burden

[3] CalRecycle amended its land application regulations on an emergency basis in 2025 and adopted final regulations earlier this year. Because the events in this case preceded those changes, the regulations in effect in 2024 control, and where there is a material difference, this memorandum cites the previous versions.

by showing "that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). The nonmoving party must then "designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

Speculation or conclusory assertions do not survive summary judgment. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "the mere existence of a scintilla of evidence" will not suffice. *Id.* at 252. At this late stage, a dispute is only genuine where "the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.* at 248.

## ARGUMENT[4]

Though pleaded as a single cause of action, Alexander Decl., Ex. 14 at ¶¶ 147-161, Plaintiffs appear to advance two RCRA theories. First, Plaintiffs allege violation of RCRA's open dumping prohibition. *Id.* ¶ 149. Plaintiffs' theory is that materials transferred by Defendants for land application exceeded Title 14's physical contaminant limits. This, Plaintiffs urge, is open dumping under RCRA.[5] *Id.* Second, Plaintiffs allege that conditions at the sites present an imminent and

---

[4] Universal joins Athens' standing arguments for Kern. Universal will not duplicate them here but is prepared to address standing at argument.

[5] Neither Plaintiffs nor their experts try to prove this alleged nonconformance as to Universal or Green Wise, and instead seek to dispense of their burden in gross. But in any event, alleged past Title 14 noncompliance is irrelevant to a RCRA open dumping claim. *See Ashoff v. City of Ukiah*, 130 F.3d 409, 412-14 (9th Cir. 1997) (RCRA does not authorize citizen suits based on more stringent state law).

substantial endangerment. *Id.* ¶ 154. Neither theory has merit.

## I. <u>Universal Never Contributed to "Open Dumps."</u>

Plaintiffs allege that Defendants, including Universal, contributed to open dumping at Irwin, Three Points, and Kern. But Plaintiffs cannot show a violation of any of EPA's open dumping regulations at 40 C.F.R. § 257.3. For most, Plaintiffs do not even try. For the others, Plaintiffs' experts' speculative and unsubstantiated conclusions do not create a dispute for trial.

"Although RCRA prohibits open dumping, and sanctions the filing of citizen suits, RCRA does not specifically define what open dumping is. Congress conferred this task on the EPA Administrator." *Hackensack Riverkeeper, Inc. v. Del. Ostego Corp.*, 450 F. Supp. 2d 467, 485 (D.N.J. 2006) (citing 42 U.S.C. § 6944(a)). Through Subtitle D, "EPA set forth regulations to clarify the bounds of open dumping . . . and identify facilities likely to cause adverse effects on health or the environment." *Living Lands, LLC v. Cline*, 657 F. Supp. 3d 831, 842 (S.D. W. Va. 2023). Those regulations, at 40 C.F.R. §§ 257.1-257.4, define "open dumping" under RCRA, *see* 40 C.F.R. § 257.1(a), for the land application sites in this case. *See* 40 C.F.R. § 257.2 ("Land application unit means an area where wastes are applied onto or incorporated into the soil surface . . . for agricultural purposes or for treatment and disposal.").[6]

A "disposal practice"[7] is thus "open dumping" under RCRA if it violates EPA's regulations for (1) floodplains, *id.* § 257.3-1; (2) endangered species, *id.*

---

[6] EPA's regulations also define open dumping for disposal facilities and practices not at issue here, including non-municipal non-hazardous waste disposal units that receive very small quantity generator hazardous wastes (40 C.F.R. §§ 257.5-257.30), facilities that dispose of coal combustion residuals (40 C.F.R. §§ 257.50-257.107), and municipal solid waste landfills (40 C.F.R. pt. 258).

[7] Universal does not concede that land application of green waste fines from Green Wise constitutes "disposal" under RCRA. But deciding that issue is not necessary to grant this motion.

§ 257.3-2; (3) surface water, *id.* § 257.3-3; (4) ground water, *id.* § 257.3-4; (5) food-chain crops, *id.* § 257.3-6; (6) disease vectors, *id.* § 257.3-6; (7) air quality, *id.* § 257.3-7; and (8) safety, *id.* § 257.3-8.[8] Plaintiffs show a violation of none.

**A. 40 C.F.R. § 257.3-2 – Endangered Species.**

EPA's regulations prohibit disposal practices that cause "the taking of any endangered or threatened species of plants, fish or wildlife . . . . [or] the destruction or adverse modification of the critical habitat of endangered or threatened species." 40 C.F.R. § 257.3-2(a)-(b); *see also id.* § 257.3-2(c) (definitions).[9] Plaintiffs have no evidence of presence, much less take, of any federally listed species. Nor do Plaintiffs allege the destruction or adverse modification of any designated critical habitat. *See* 50 C.F.R. §§ 17.95-17.96 (U.S. Fish & Wildlife Service's critical habitat designations).

At Irwin, the Chow/Dalby Report supposes that the federally threatened spreading navarretia had a "low" pre-disturbance potential and now has no potential to occur. UF ¶ 3. But the report itself does not bear this out. As Ms. Chow admits, spreading navarretia needs wetlands. *Id.* The Irwin Site is in the *Mojave Desert* and was never suitable habitat. *Id.* ("The drainage/wash in the southern portion of the site may receive seasonal runoff; however a drainage feature does not represent suitable habitat." (citations omitted)). For this reason, at deposition, Chow conceded the spreading navarretia should not have been included in the final report. *Id.*

At Three Points, Chow relies on endangered Mojave Desert tortoise, asserting a change from "low potential to occur" to a vague and undefined "even

---

[8] Plaintiffs offer no evidence on EPA's provisions for flood plains or impacts to food-chain crops. This memorandum discusses the remaining factors.

[9] "Take" under the Endangered Species Act "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a listed species. 16 U.S.C. § 1532(19).

lower potential to occur." *Id*. Again, Chow cites no evidence that the Mojave Desert tortoise has ever been present at the site, much less any take. *See* 40 C.F.R. § 257.3-2(a)–(b).

Finally, for Kern, the Chow/Dalby Report identifies no ESA listed species. *See* UF ¶ 3. Plaintiffs thus cannot prove take or destruction of critical habitat. 40 C.F.R. § 257.3-2.

**B. 40 C.F.R. § 257.3-3 – Surface Water.**

EPA's RCRA regulations bar waste disposal practices that discharge pollutants or fill[10] into waters of the United States, as defined by the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., and implementing regulations at 33 C.F.R. pt. 323 (U.S. Army Corps of Engineers Definition) and 40 C.F.R. § 120.2 (U.S. EPA definition). 40 C.F.R. § 257.3-3. Waters of the United States is a term of art referring to "standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes[,]" *Rapanos v. United States*, 547 U.S. 715, 739 (2006), as well as tributaries of those waters and surrounding "indistinguishabl[e]" wetlands. *Sackett v. EPA*, 598 U.S. 651, 676 (2023). This definition "exclude[s] channels containing merely intermittent or ephemeral flow." *Rapanos*, 547 U.S. at 733-34.

There are no streams, oceans, rivers, lakes, or jurisdictional wetlands near the sites. And while Plaintiffs' experts allege ephemeral streams and washes that pass through or near the sites, those are not waters of the United States. Plaintiffs thus cannot show impacts to surface waters. 40 C.F.R. § 257.3-3.

**C. 40 C.F.R. § 257.3-4 – Ground Water.**

EPA's regulations prohibit disposal practices that "contaminate an underground drinking water source." 40 C.F.R. § 257.3-4. "Contaminate" means

[10] Under the Clean Water Act, "fill" means placing material in jurisdictional waters that either (1) replaces the water with dry land or (2) alters the bottom elevation of the water body. 33 C.F.R. § 323.2(e) (2025).

causing or contributing to a maximum contaminant level exceedance, as specified in the regulations. *Id.* § 257.3-4(c)(2); *see also* 40 C.F.R. pt. 257, app. I.

Perez speculates about pathways to groundwater impacts.[11] *See* UF ¶ 4. But he offers no soil testing data, modeling showing potential groundwater impacts, or explanation about how materials could pass through hundreds of feet of soil, clay, and rock to groundwater. *Id.* An even more fundamental failing is that Perez does not address (1) which substances he fears will enter the groundwater or (2) how those substances will cause or contribute to an exceedance. *Id.*; *see* 40 C.F.R. § 257.3-4(c)(2).

Courts have granted summary judgment even where plaintiffs made stronger showings than these. In *Covington v. Jefferson County*, the Ninth Circuit affirmed summary judgment where plaintiffs relied on evidence of lead infiltration up gradient from the challenged municipal landfill. 358 F.3d 626, 644-45 (9th Cir. 2004). While the court rightly held that upgradient data was not probative of alleged downgradient impacts, the plaintiffs in *Covington* at least bothered to test the water. *See id.; see also O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642, 655 (E.D. Pa. 1981) (finding no groundwater contamination violation where testing showed no regulatory exceedance (citing 40 C.F.R. § 257.4; *id.* pt. 257, app. I)). Plaintiffs' speculation does not create a triable issue of fact on groundwater contamination. *See Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 453 (E.D. Pa. 2015) (where experts failed to show how contaminant would harm plants, the "factfinder would have to speculate . . . . [c]laims may not survive summary judgment based on speculation." (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005))).

---

[11] Ms. Dalby's portions of the Chow/Dalby Report also suppose groundwater impacts. *See* Alexander Decl., Ex. 7 at 30. But at deposition, Ms. Dalby conceded that those conclusions were based solely on the lack of an impermeable liner and that she did not further evaluate groundwater. UF ¶ 4.

**D. 40 C.F.R. § 257.3-6 – Disease.**

EPA requires that disposal practices minimize disease vectors—"rodents, flies, and mosquitoes capable of transmitting disease to humans"—by "the periodic application of cover material or other techniques." 40 C.F.R. § 257.3-6. "Periodic application of cover material means . . . at the end of each operating day or at such frequencies and in such a manner as to reduce the risk of fire and to impede vectors access to the waste." *Id.* § 257.3-6(c)(4).

Daily cover requirements apply only to operating landfills. *See, e.g.*, *Covington*, 358 F.3d at 645 (operating non-municipal solid waste landfill). Plaintiffs' experts never discuss daily cover, even while the sites were operating. And by the time Plaintiffs filed their Complaint, operations at Irwin, Three Points, and Kern had ceased months before, making any claim on this point untimely.

Regardless, Plaintiffs come to summary judgment with no evidence on disease vectors. *Cf. O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642, 655-56 (E.D. Pa. 1981) ("No evidence correlated the cover conditions at the fill with any risk estimate of disease vectors, and accordingly, I find no violation of this requirement of RCRA."). Plaintiffs' experts make no mention of disease, mosquitoes, or flies. Rodents are mentioned a handful of times in the Chow/Dalby Report, largely as prey for other animals, and never as disease vectors.[12] *See, e.g.*, UF ¶ 5 (discussing badgers preying on "burrowing rodents"); *id.* (discussing prairie falcons preying on "small rodents"). Again, Plaintiffs fail to advance evidence for trial.

**E. 40 C.F.R. § 257.3-7 – Air.**

Section 257.3-7 seeks to protect air quality by prohibiting "engag[ing] in open burning of residential, commercial, institutional or industrial waste" and requiring compliance with the Clean Air Act. 40 C.F.R. § 257.3-7(a)-(b).

---

[12] The other rodent mentioned in the Chow/Dalby Report is the Tehachapi pocket mouse, discussed as a sensitive species. *See, e.g.*, Alexander Decl., Ex. 7, at 25.

Plaintiffs have no evidence that the sites violated any requirements under California's State Implementation Plan. *See* 40 C.F.R. § 257.3-7(b). And there is no allegation that Mr. Irwin, Cal-Spreading, LLC, or any other Defendant "engage[d] in" open burning. *See id.*; *see also Engage*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/engage#h1 (last visited Aug. 31, 2026) (defining engage when paired with "in" to include "to begin and carry on an enterprise or activity" and "to do or take part in something"). The plain language of the regulation requires intent. And there is no evidence that any Defendant intended to (or did) burn waste.

**F. 40 C.F.R. § 257.3-8 – Safety.**

Finally, 40 C.F.R. § 257.3-8 seeks to protect public safety by addressing explosive gas concentrations (specifically methane, $CH_4$), fire-related threats to persons or property, bird hazards to aircraft, and "potential health and safety hazards" from uncontrolled public access. Plaintiffs have developed no evidence on these criteria. They only try for fire risk. But Perez's[13] conclusory assertion that "[t]he fire hazard is not hypothetical" is based solely on a literature review, UF ¶ 6, not actual field work or testing. *Contra* UF ¶ 6 (showing lack of conditions that could lead to self-heating or self-ignition). Historical fires, standing alone, do not support an inference of ongoing fire risk. At the very least, Plaintiffs should have inspected burn sites to compare the conditions there to those here.

Plaintiffs have thus failed to raise a triable issue of fact on open dumping. For this straight-ahead reason, the Court should grant summary judgment on Plaintiffs' open dumping claim for Universal.

---

[13] At deposition, Perez acknowledged he has no background in fire science and is not qualified to offer fire opinions. UF ¶ 6. If necessary, Universal will move to exclude Perez's fire opinion as not based on specialized training or expertise. Fed. R. Evid. 702(a).

## II. Wholly Past Open Dumping Violations Are Not Actionable.

Plaintiffs' claims under Section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), also fail because the alleged violations are wholly past and thus beyond RCRA's reach. RCRA's citizen suit provision authorizes private enforcement actions only against entities "alleged *to be in violation* of any permit, standard, regulation, condition, requirement, prohibition, or order" under the Act. 42 U.S.C. § 6972(a)(1)(A) (emphasis added). As the Supreme Court made clear in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987), identical "to be in violation" language in the CWA's citizen suit provision "does not permit citizen suits for wholly past violations." *Id.* at 64. Rather, the "most natural reading" requires "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, *a reasonable likelihood that a past polluter will continue to pollute in the future*." *Id.* at 57 (emphasis added).

Courts consistently apply *Gwaltney*'s holding to RCRA's open dumping provision, § 6972(a)(1)(A). *See, e.g.*, *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 511 (4th Cir. 2015) (it is "logical and appropriate" to apply *Gwaltney* to RCRA's identical "to be in violation" language); *S. Rd. Assocs. v. Int'l Bus. Machines Corp.*, 216 F.3d 251, 257 (2d. Cir. 2000) ("historical act[s] cannot support a claim for violation of 42 U.S.C. § 6945(a) and 40 C.F.R. § 257.3-4(a)."); *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1312-13, 1315 (2d Cir. 1993) (where lead "discharges . . . ceased on December 31, 1986," suit filed on April 24, 1987 "allege[d] a 'wholly past' RCRA violation and is dismissed under *Gwaltney*."); *Conservation Law Found. v. Shell Oil Co.*, 628 F. Supp. 3d 416, 439 (D. Conn. 2022) (must show defendant "'was engaged in the act of open dumping'"); *Sullins v. Exxon/Mobil Corp.*, No. 08–04927 CW, 2010 WL 11575443, at *3 (N.D. Cal. May 18, 2010) ("continuous or intermittent violation will support a claim only if there is a reasonable likelihood that the past polluter will continue to pollute in the future.").

This reflects the statutory structure and purpose of citizen suits, which are "meant to supplement rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60. The pre-filing notice serves "to give the alleged violator an opportunity to bring itself into complete compliance . . . and thus make a citizen suit unnecessary." *Id.* Suits for past violations would render that provision "gratuitous." *Id.*

As applied here, it is undisputed that all transfers of green waste from Green Wise to the sites ceased well before Plaintiffs filed this action. Specifically:

(1) Green Wise permanently discontinued transfers of green waste to Cal-Spreading before the end of 2024, when Cal-Spreading ended operations. *See, e.g.*, UF ¶ 7 (Cal-Spreading ended operations at Three Points in November or December 2024); *id.* (Cal-Spreading ended operations at Kern in October 2024); *id*. (Cal-Spreading ended operations at the Irwin Site around Thanksgiving 2024).

(2) Since that date, no green waste from Green Wise has been received, stored, processed, or applied at any of the three sites. UF ¶ 8.

(3) Cal-Spreading is defunct. *Id*.

(4) Universal now sends green waste fines to rehabilitate a distressed golf course. UF ¶ 9. So Green Wise will not resume land application activities at any of the three sites in the future. *Id*.

These undisputed facts reveal that any alleged improper land application of green waste is wholly past and not actionable. *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1159 (9th Cir. 1989) (RCRA only authorizes prospective relief).

If Plaintiffs argue that the mere presence of previously land applied green waste constitutes a continuing violation, that argument fails. The *Gwaltney* inquiry focuses on whether the defendant is engaged in an ongoing *violation*, not on the residual consequences of past conduct. "To be in violation" means present and future conduct, not the passive existence of material that was placed—

lawfully or unlawfully—in the past. *See Verse Two Props., LLC v. MedPlast Fremont, Inc.*, No. 5:14-cv-03765-EJD, 2015 WL 6955133, at *4 (N.D. Cal. Nov. 10, 2015) ("Although the hazardous substance remains on the Property, there are no allegations that any of the Defendants continue to operate on the Property." (quoting *Gwaltney*, 484 U.S. at 59)).

To be sure, some courts have held that current landowners can be liable in some circumstances for unremedied hazardous wastes.[14] *N. Cal. River Watch v. Exxon Mobil Corp.*, No. C 10-0534 PJH, 2010 WL 3184324, at *3-4 (N.D. Cal. Aug. 11, 2010) (summarizing cases, "most from out of circuit district courts[,]" imposing liability on current owners/operators). Those authorities are inapposite for two reasons. First, they involve "the continued presence of hazardous contaminants," *California v. M&P Invs.*, 308 F. Supp. 2d 1137, 1146 (E.D. Cal. 2003), and worsening environmental harm. *Id.* at 1148 (industrial solvents perchloroethylene (PCE) and trichloroethylene (TCE)); *see also, e.g.*, *Marrero Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 597 F. Supp. 2d 272, 283 (D.P.R. 2009) (continued leaking of underground petroleum storage tanks); *Acme Printing Ink Co. v. Menard, Inc.*, 891 F. Supp. 1289, 1293 (E.D. Wis. 1995) ("Hazardous wastes generated by Acme were discovered at the Fadrowski site."). Here, there is no evidence of disposal of hazardous waste at any of the sites, let alone evidence of a continuing release.

Second, as the *Northern California River Watch* court explained, liability for ongoing pollution or hazardous conditions cannot reach past owners or operators, much less past producers or generators. *See* 2010 WL 3184324, at *5; *see also June v. Town of Westfield*, 370 F.3d 255, 259 (2d Cir. 2004) (plaintiff

---

[14] Most of these cases trace back to *Gache v. Harrison*, 813 F. Supp. 1037 (S.D.N.Y. 1993), which is no longer good law after the Second Circuit's decisions in *Conn. Coastal Fishermen's Ass'n*, 989 F.2d at 1305, and *S. Rd. Assocs.*, 216 F.3d at 251, summarized above.

failed "to allege that, at the time of the filing of his lawsuit, the defendants 'continued to introduce substances'" (quotation omitted)). Again, RCRA's structure lends light. The pre-filing notice should "allow a polluter to bring itself into compliance." *Bd. of Comm'rs of Cnty. of La Plata v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185, 1201 (D. Colo. 2009). But "[o]nce a defendant is no longer an owner or operator of a polluting facility, it has 'no control over the pollution source' and would have no ability to 'bring itself into complete compliance.'" *Id.* (quotation omitted). The same logic applies with more force to past producers or generators. *See Bd. of Comm'rs of Cnty. of La Plata*, 598 F. Supp. 2d at 1201.

Even if Plaintiffs could show a violation of EPA's open dumping regulations, that conduct would be "wholly past" and so not actionable under RCRA's open dumping prohibition. For this reason, too, this Court should grant summary judgment on Plaintiffs' open dumping claim for Universal.

## III. Plaintiffs Prove No Imminent and Substantial Endangerment to Human Health or the Environment.

RCRA also provides for citizen suits "against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). An endangerment is only "imminent" if it "threaten[s] to occur immediately." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (1996). The phrase "may present" imminent harm "quite clearly excludes waste that no longer presents such a danger." *Id.* at 486. The threat must be "present *now*," even if its impact "may not be felt until later." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). And "substantial" means "serious." *Id.* "[I]njunctive relief under RCRA should not issue 'where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree.'" *Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062, 1083 (D. Or. 2024).

"[S]ummary judgment is appropriate where a plaintiff has (1) established only a speculative prospect of future harm and (2) has not provided sufficient information for a reasonable factfinder to find the harm at issue rises to the level of substantial endangerment." *Living Lands, LLC*, 657 F. Supp. 3d at 848.

**A. Plaintiffs Have No Evidence of Air Quality Harms.**

Plaintiffs have no evidence that waste at any site presents an imminent and substantial endangerment to air quality. None of Plaintiffs' experts provide air quality data, air sampling, emissions characterization, or dispersion modeling connecting waste at the sites to airborne harm. *See H & H Holding, L.P. v. Chi Choul Lee*, No. 12-5433, 2014 WL 958878, at *5 (E.D. Pa. Mar. 6, 2014) (granting summary judgment where plaintiff had "no soil vapor information," conducted no "indoor air monitoring," and presented "no evidence that PCE air concentrations may cause harm"). This failure of proof warrants summary judgment on any air-related endangerment theory.

Perez's Section 10.3, titled "Air Transport (Combustion of Waste)," is not enough. UF ¶ 10.[15] Perez mentions the July 6, 2024 fire at the Three Points Site and discusses historical mulch fires between 2020 and 2024. Alexander Decl., Ex. 9 at 62-63. He also speculates about combustion byproducts, including dioxins, furans, and metals. UF ¶ 10. But Perez offers no harm analysis.

In fact, Perez establishes no air exposure pathway at all. He assumes the presence of CCA-treated wood and PVC-containing waste at the sites. *Id.* But Perez did no testing to confirm, relying solely on visual inspection. *Id.* And Perez offers no model showing how combustion products would disperse from the sites at harmful concentrations.

---

[15] Mr. Perez is a hydrologist and hydrogeologist. UF ¶ 10. Air dispersion modeling is outside his area of expertise, and he performed no assessment of wind direction or velocity at any site, notwithstanding that data is publicly available. *Id.*

Plaintiffs lack evidence of either an existing air quality impairment or a realistic pathway for airborne harm from the sites. *See Price v. U.S. Navy*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992). The Court should grant summary judgment on alleged air impacts for Universal. *See Celotex Corp.*, 477 U.S. at 323.

**B. Plaintiffs' Self-Ignition Theory Is Implausible.**

Perez's Opinion 6 asserts that stockpiled mulch and green waste may self-ignite. He argues that fires attributable to spontaneous combustion have already occurred at Three Points[16] and elsewhere. Alexander Decl., Ex. 9 at 14-15. But Perez performed no analysis at all; he simply misapplied a single study, Buggeln and Rynk (2002). *See* UF ¶ 11.

Again, the mere fact of historical fires does not, alone, prove self-ignition risk at *these* sites. *See Meghrig*, 516 U.S. at 486 ("imminent harm quite clearly excludes waste that no longer presents such a danger."); *contra Alexander Decl., Ex. 9, at 62-63*. At a minimum, Plaintiffs should have retained a fire expert to (1) evaluate conditions at fire sites; (2) discover the cause of those fires; (3) provide a comparison to the conditions at the sites here; and (4) model fuel loads and probable spread to assess the potential outcome. Without at least this, Plaintiffs cannot present admissible expert evidence supporting their fire theory.

In contrast to Perez, Darby evaluated the potential self-ignition at all three land application sites. UF ¶ 11. The results are unequivocal. Material depths are far below the critical pile size associated with spontaneous combustion. *Id.* (author of study cited by Perez "is not aware of documented spontaneous combustion events occurring in organic material accumulations less than approximately *12 to 15 feet.*" (emphasis added)). There is no evidence supporting

---

[16] CAL FIRE classified the Veronica Fire as a wildfire and the cause as "undetermined." Darby Rebuttal at 2-7 (citing CAL PROD M 0022). Tetra Tech dug into the burn area and found only surface-level charring. Darby Report at 8-12.

the microbial activity that drives self-heating. *Id*. No smoke, steam, odors, smoldering, or any other indicator of active heating was observed at any site. *Id.* In fact, background soil temperatures exceeded mulch temperatures. *Id.* And in all cases, observed temperatures were well below ignition range. *Id.* ("spontaneous combustion typically result[s] in a smoldering fire at approximately 150°C to 200°C (300°F to 400°F)."). The Darby Rebuttal states the conclusion directly: "There is no expectation or evidence of spontaneous combustion at the three subject Sites." *Id.*

There is no evidence of an imminent self-ignition threat at any of the sites. Historical fires do not carry Plaintiffs' burden. And Plaintiffs have no viable expert testimony to support their theory. The Court should grant summary judgment for Universal against Plaintiffs' self-ignition theory.

### C. Plaintiffs Show No Water Impacts.

Dalby's portion of the Chow/Dalby Report[17] assumes impacts to ephemeral surface waters based on topographical imagery. *See* UF ¶ 12 (describing hydrology desktop methodology). Perez speculates about infiltration through soils but did no modeling or testing to prove those theories. UF ¶ 14. Neither report demonstrates a threat to water resources.

Dalby's opinion rests entirely on a desktop methodology using satellite imagery and mapping overlays to assume ephemeral waters at the sites. UF ¶ 12. No water was observed at the time of Chow's field visit, and Dalby never visited the sites at all. *Id*. She performed no jurisdictional delineation or ordinary high watermark analysis. *Id.* In fact, Dalby admits she does not know the last time surface waters flowed through any of the alleged washes. *Id.* In short, Dalby's report cannot even prove the alleged ephemeral features exist.

---

[17] Plaintiffs submitted a joint report for Chow and Dalby. Chow opines on wildlife and plant habitat. Alexander Decl., Ex. 7 at 3 (opinions 1 and 2). Dalby opines on jurisdictional waters and restoration. *Id.* at 3-4 (opinions 3 and 4).

Dalby's report is equally bereft of evidence showing actual harm. She took no samples and reviewed no water quality data. UF ¶ 13. Indeed, she considered no laboratory data at all. *Id.* Dalby prepared no sediment transport, runoff, or windblown debris modeling. *Id.*[18] Her report does not quantify what level of rain would cause a significant runoff event. *See id*. ("Although average rainfall is unlikely to run off the site, an above average rainfall *could* contribute to runoff" (emphasis added)). In short, determining impacts to jurisdictional waters requires "much more additional field work." Alexander Decl., Ex. 10 at 72, ll. 17-25. All Dalby can say now is that the presence of materials is itself an impact of some kind. *See id.* at 115, ll. 9-17. But that does not prove an imminent and substantial endangerment. *See City of Fresno v. United States*, 709 F. Supp. 2d 934, 943 (E.D. Cal. 2010) ("To show an 'imminent and substantial' threat, the plaintiff must do more than establish the presence of solid or hazardous wastes at a site.").

Perez's opinions on water impacts have similar data gaps. While Perez performed limited analytical testing of surface materials, he did no work to prove groundwater impacts. UF ¶ 14. He did not test underlying soil or confirm any migration towards the water table. *Id.* (Perez alleges soil impacts without soil data). He took no samples within the vadose zone, no groundwater samples, and no samples from residential wells. *Id*. Perez likely did not do so because the limited data he collected evinces no contamination. *See id*. (Love Report discussing background levels); *see also Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 212-14 (2d Cir. 2009) (exceeding screening level standards alone does not prove endangerment).

Perez has not shown, and cannot show, a pathway to groundwater. *See City of Fresno*, 709 F. Supp. 2d at 941-42 (summary judgment appropriate where expert report that "did not state with specificity the degree of potential exposure

[18] This is unsurprising, as Dalby confirmed that "[m]odeling is outside the scope of [her] expertise." Alexander Decl., Ex. 10 at 84, ll. 4-5.

risk to humans and the environment . . . or that there were realistic pathways of exposure”). He failed to investigate the specific lithology beneath the sites, instead assuming that “this is sand and clay pretty much all the way down.” Alexander Decl., Ex. 11 at 139, ll. 17-23. He cannot say how long it will take for surface materials to reach groundwater. *Id.* at 132, ll. 20-22. He prepared no fate and transport modeling or groundwater modeling. UF ¶ 14. He offers no calculations showing the mass of contamination that could migrate, the distribution coefficient, or the retardation factor. *Id*. Perez’s groundwater opinion is an *ipse dixit* statement that materials are on site with “a potential to impact to groundwater at least.” Alexander Decl., Ex. 11 at 128, ll. 19-20. Again, this does not satisfy Plaintiffs’ burden. *See City of Fresno*, 709 F. Supp. 2d at 943.

Finally, even if Plaintiffs had evidence of contamination, more work would remain. *See Miller v. City of Fort Myers*, 424 F. Supp. 3d 1136, 1147 (M.D. Fla. 2020) (summarizing cases requiring “evidence of anyone potentially drinking contaminated water”). Mere speculation does not suffice. *Id.* at 1194; *compare* UF ¶ 14 (speculating about presence of wells in the area). Plaintiffs have not created a triable issue on water impacts.

**D. Plaintiffs’ Alleged Wildlife and Habitat Harms Are Speculative.**

Plaintiffs’ wildlife expert report is, by its own admission, a preliminary desktop habitat screening, not evidence of habitat loss. UF ¶ 15. Chow found no evidence of any special-status species ever being present at any site, *id.*, and did not consider regional habitat for context. UF ¶ 16. The sites were already disturbed by agricultural use, and any impact to habitat is historical, not imminent. For these reasons, Plaintiffs fail to prove an imminent and substantial endangerment to wildlife.

1. <u>The Chow/Dalby Report does not prove habitat loss.</u>

As discussed in Section I.A., the Chow/Dalby Report is a “literature review” that uses “Desktop Review and Screening Methods.” UF ¶ 15. The report

is intended as the first step of a "consultation." *Id*. More work remains; "[a]gronomic soil suitability tests would need to be performed in locations fairly distributed throughout the [] site to determine the site's likelihood for successful plant growth." *See, e.g.*, Alexander Decl., Ex. 7 at 31, 46, 72. Dalby describes the report as a "pre-mitigation monitoring plan" with "many factors that still need to be considered." Alexander Decl., Ex. 10 at 64, ll. 7-13. A credible expert opinion on endangerment would include much more, including field surveys, formal species assessments, botanical inventories, and water quality, soil, or chemical testing. Plaintiffs' inchoate analysis cannot survive summary judgment.

The Second Circuit's decision in *Simsbury-Avon Preservation Club, Inc.* is instructive. 575 F.3d 199. There, neighboring homeowners alleged lead contamination from a gun range. *Id.* at 205. But plaintiffs' expert concluded only that the presence of lead on the site '"represents a *potential exposure risk* to both humans and wildlife'" and "[a] risk assessment utilizing the data obtained during this investigation would be necessary to evaluate the *degree of risk* to humans and wildlife." *Id*. at 211 (emphasis in original). Because the plaintiffs never did that assessment, *id.*, the court affirmed summary judgment. *See id.* (record was "insufficient to permit a factfinder to assess the magnitude of the possible risk").

*Living Lands, LLC v. Cline*, 657 F. Supp. 3d 831 (S.D. W. Va. 2023) and *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690 (W.D.N.Y. 2011) reinforce this result. In *Living Lands, LLC*, the court granted summary judgment where plaintiffs offered "only conclusory statements that unverified [contaminant exceedances] could endanger the environment." 657 F. Supp. 3d at 849. In *Lewis*, the court explained that excluded expert testimony would not have saved the claim because the expert "repeatedly stated that a risk assessment, which he did not perform, is necessary" to determine the level of risk or harm. 786 F. Supp. 2d at 710.

The Chow/Dalby Report fails for the same reasons. Although Chow and Dalby couch their report in litigation language, supposing that "[i]f these special-

status species were to occur on the [site], the changes in potential signify an imminent risk to these species[,]" Alexander Decl., Ex. 7 at 30, 45, 71, neither prepared a risk assessment. Mere conclusory language will not survive summary judgment. *Living Lands, LLC*, 657 F. Supp. at 849.

2. Plaintiffs cannot show substantial harm to wildlife.

Even taking the Chow/Dalby Report's methodology at face value, its findings establish no confirmed presence nor a mechanism for biological harm. Each species assessment relies on range-overlap screening. There is no evidence that any special-status species has ever been observed at any land application site, and Chow offers no explanation of how any alleged habitat loss will impact local populations.

Chow queried various databases for the species discussed in the report. Alexander Decl., Ex. 7 at 8-9. None show that any species has ever occupied habitat at Irwin, Three Points, or Kern. Rather, for each species, the report recites the same formula: "[Site] is within the known geographic and elevation range of [species] (CDFW, 2026b)." *See, e.g.*, *id*. at 30, 38, 67. Based on this data, the report assigns each species a "potential for occurrence" rating (*e.g.*, high, moderate, low).[19] UF ¶ 15. No species at Irwin, Kern, or Three Points Sites is rated "high;" the highest rating is "moderate," again based solely on range overlap screening and general habitat characteristics rather than direct observation. *Id*.[20]

---

[19] Ms. Chow does not assign any quantitative value to these "potential for occurrence" ratings. UF ¶ 16. She concedes that she has no published literature source defining the categories, which are instead "based on experience." *Id.*

[20] The evidentiary gaps are particularly glaring at the species-account level. For several species, the report concedes that "no qualifying nearby occurrence is identified in this account." *See* Alexander Decl., Ex. 7 at 38, 40, 66-67, 69-70. For burrowing species such as the desert kit fox and burrowing owl, the report

But perhaps Chow's most fundamental shortcoming is her failure to provide any context to evaluate the severity of any impact. The Chow/Dalby Report is silent as to nearby habitat quality and Chow admits she did no regional habitat analysis. UF ¶ 16. Without this data, it is impossible to assess the significance, if any, of the alleged habitat modification. *See id.*; *Nat'l Wildlife Fed'n v. Burlington N. R.R.,* 23 F.3d 1508, 1513-14 (9th Cir. 1994) (rejecting habitat modification claim where affected habitat was "localized" and did not significantly affect grizzly feeding habits in the broader ecosystem); *see also Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010-11 (9th Cir. 2006) (explaining that alleged habitat impacts must be "read in context").

These failings are underscored by comparison to the ESA, the statute Congress designed to protect sensitive wildlife. Section 9 of the ESA prohibits the "take" of protected wildlife, which includes "harm." 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). "Harm" means "an act which actually kills or injures wildlife" and can include significant habitat modification or degradation that "impair[s] essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) ("habitat modification does not constitute harm unless it 'actually kills or injures wildlife'"). In *Bernal*, the Ninth Circuit affirmed a finding of no "take" where extensive surveys "failed to produce one single detection" of the protected owl on the development parcel. In addressing whether the proposed activity would harass the owl, the court emphasized that the plaintiffs' experts "made little or no attempt to support their opinions with recorded observations" and "only offered

---

concedes that "pre-disturbance burrow availability is unknown." *See, e.g.*, *id.* at 22, 24. Chow found "*no* documented occurrences of special-status [plant] species within the Three Points site *or* the five-mile buffer." *Id.* at 70 (emphasis added). Chow's caveat that the lack of data does not confirm absence reinforces the point: Plaintiffs do not know because they did not do the work. *Id.*

speculation." *Id.* at 926-27. Here, the Chow/Dalby Report likewise identifies only potential habitat and confirms no special-status species at any site.

Chow's speculation is the antithesis of RCRA's "imminent and substantial" requirement. *See* UF ¶ 16 ("The records indicate that there is a good probability that they possibly – they potentially occurred on those sites."). A helpful expert gives data, observations, some kind of quantifiable assessment to aid the Court. Chow refuses. *See id*. Chow cannot show an imminent and substantial impact through her speculative habitat assessment.

3. Any *de minimis* habitat alteration is historical, not "imminent."

Finally, any incremental habitat degradation was *de minimis* because all three sites were already disturbed by prior agricultural use. More, the impacts alleged are all historical, and thus not "imminent" under RCRA.

The Chow/Dalby Report confirms that the baseline at each site was non-native grassland on previously cultivated land, not pristine or sensitive habitat. UF ¶ 17. The 157.5-acre Irwin site "supported agricultural uses as early as 2016." *Id*. The report characterizes the pre-disturbance vegetation as "[n]on-native grassland and forbland" consistent with other "previously cultivated or otherwise disturbed areas." *Id.* The 59.9-acre Kern site likewise "supported agricultural uses as early as 2017[,]" *id*., and exhibited the same non-native grassland "dominated by introduced annual or perennial grasses and forbs." *Id*. Finally, the 156.1-acre Three Points site hosted agricultural activities dating back two decades, resulting in a disturbed vegetation type before land application. *Id.*

These admissions contradict Chow's theory that "unprocessed and uncomposted mulch" introduced non-native species. Alexander Decl., Ex. 7, at 29, 45, 71. The sites already hosted those species, and had for years. The "harm" identified in the Chow/Dalby Report is, at most, a marginal change to already disturbed lands. That *de minimis* impact does not summit RCRA's standards. *See Eagle Star*, 756 F. Supp. 3d at 1083.

Finally, these alleged habitat impacts occurred, if at all, at a definite time in the past when materials were placed on site. *See* UF ¶ 17 (change occurred "following the disturbances from Defendants' [alleged] activities at each site."). The Chow/Dalby Report describes a one-time physical alteration of habitat, not continuing habitat harm. *See Meghrig*, 516 U.S. at 486 ("'may present' imminent harm quire clearly excludes waste that no longer presents such a danger"); *id.* at 485-86 (CERCLA, not RCRA, is the general cleanup statute). That wastes may persist on the landscape is not itself imminent or ongoing harm. *Id.* at 486.

Plaintiffs' alleged habitat impacts are *de minimis* considering the history of agricultural use at the sites. And any marginal loss of habitat quality is a historical injury, not an "imminent and substantial endangerment." 40 U.S.C. § 6972(a)(1)(B). Plaintiffs' wildlife and habitat impacts theory fails.

**CONCLUSION**

Plaintiffs cannot show a historical—let alone ongoing—violation of EPA's open dumping regulations. So Plaintiffs' open dumping claim against Universal fails. *Id.* § 6972(a)(1)(A). And Plaintiffs likewise cannot show that Universal contributed to present-day conditions that "may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B). For these reasons, this Court should grant summary judgment for Universal.

Dated: September 18, 2026

*<u>/s/ Tyler M. Alexander</u>*
Alan N. Bick
Caroline L. Plaint
Tyler M. Alexander
Heather Dadashi
BICK LAW LLP

*Attorneys for Defendant*
UNIVERSAL WASTE SYSTEMS, INC.

**Declaration Certifying Limited Use of Artificial Intelligence**

In accordance with this Court's standing order, undersigned counsel certifies the following:

(1) I did not use AI to draft any portion of this filing. Bick Law LLP has access to the AI platform Harvey, and I use that tool for tasks like creating tables comparing deposition testimony from different witnesses. But I do not use Harvey or any other AI tools to draft briefs.

(2) I occasionally use Westlaw Precision's AI-Assisted Research function as a jumping off point for legal research. I do not recall whether I did so for this brief. However, I never copy any text from the AI-Assisted Research function into outlines or briefs. All case citations, quotes, and parentheticals come from the text of the actual document on Westlaw. If there are any misquotations in this brief, those are genuine transcription errors made by me, not by any AI platform.

(3) I use a Word plugin by Ross Guberman called BriefCatch to suggest stylistic and grammatical edits and to catch bluebooking errors. BriefCatch includes AI features, but I do not use those functions.

Dated: September 18, 2026

*/s/ Tyler M. Alexander*
Tyler M. Alexander
BICK LAW LLP

*Attorney for Defendant*
UNIVERSAL WASTE SYSTEMS, INC.